## THE ORDINARY v. COOLEY AND WEST.

1. One of the conditions of an ordinary administration bond is, that the administrator will pay over to the persons entitled all the residue of the goods and chattels found remaining upon the account of the administrator. *Held*, that it is no breach of this condition that the administrator has or has not paid over to the creditors their *pro rata* share ordered to be paid to them by the Orphans Court, and that the remedy of the creditors is under the other conditions of the bond.
2. The history and origin of the different conditions of the administrator's bond commented upon.

The suit is upon an administration bond, given by the defendants, as administrators of the personal estate of Samuel Cooley, deceased. The declaration sets out the usual conditions of the bond, one of which is as follows : " all the rest and residue of the said goods, chattels, and credits which shall be found remaining upon the account of the administration, the same being first examined and allowed by the judges of the Orphans Court of the county, or other competent authority, shall deliver and pay unto such person or persons, respectively, as is, are, or shall by law be entitled to receive the same."

Of this condition the plaintiff assigned the following breach : " and all the rest and residue of the goods and chattels and credits which are found remaining upon the said administration, the same having been allowed by the Prerogative Court of the state of New Jersey according to law, he did not and has not paid the same, or any part thereof, unto the person or persons, respectively, who were and are entitled to receive the same, but hath hitherto neglected and refused, and still does neglect and refuse so to do, contrary to the tenor and effect of the condition of the said writing obligatory, to wit," &c.

To this assignment the defendants pleaded, that as to that breach, " the plaintiff ought not to have or maintain his aforesaid action thereof against them, because they say,

there was no residue of the goods, chattels, and credits found remaining upon the allowance of the account of the said John B. Cooley, administrator, &c., of the said Samuel Cooley, deceased, &c., to be paid to any person or persons; but on the contrary, that upon such accounting, and by the decree of said court thereupon, the said estate of the said Samuel Cooley, deceased, was found and deemed to be insolvent, and the said goods, chattels, and credits were insufficient to pay, satisfy, and discharge the debts of the said Samuel Cooley, deceased, and this the defendants are ready to verify," &c.

The plaintiff replied, *precludi non*, &c., " because, he says, there was a large residue of the goods, chattels, and credits found remaining upon the allowance of the said John B. Cooley, administrator, &c., of all and singular the goods, chattels, and credits of the said Samuel Cooley, deceased, of his said administration, &c., to be paid to the person or persons entitled to receive the same ; that is, there was found to be remaining in the hands of the said John B. Cooley, administrator, &c., of the residue of the goods, chattels, and credits aforesaid, the sum of four thousand one hundred and eleven dollars and eighty-five cents; and by the decree of the said Prerogative Court, the said John B. Cooley, administrator as aforesaid, was directed to pay to each one of the creditors named in the said account the sum of eighty-three cents and seventy-seven hundredths of a cent to each dollar of said creditor's respective claim out of said residue, which was sufficient to make said payments. And this the plaintiff prays," &c.

To this replication there was a demurrer and joinder.

The case argued by *G. A. Allen* and *M. Beasley*, for the demurrants, and *A. G. Richey*, for the plaintiff.

CHIEF JUSTICE. Upon this demurrer to the plaintiff's replication to the fifth plea filed by the defendants in answer to the fourth breach assigned in the plaintiff's declaration, which is based upon that clause in the administration bond

sued upon, which provides that "all the rest and residue of the said goods, chattels, and credits which shall be found remaining upon the account of the said administration, the same being first examined and allowed of by the judges of the Orphans Court of the county, or other competent authority, shall deliver and pay unto such person or persons, respectively, as is, are, or shall, by law, be entitled to receive the same." It stands admitted that the estate of the deceased was insolvent, and so found to be by the Prerogative Court, and that the administrator was found, by the decree of the Prerogative Court, to have in his hands, for distribution among the creditors, the sum of four thousand one hundred and eleven dollars and eighty-five cents, and was directed to pay to each of the creditors of the deceased upon their claims, eighty-three cents and seven-hundredths of a cent to the dollar. The demurrer raises the question whether that clause of the condition is for the benefit of creditors, or for the next of kin only, or persons entitled by will to the residue.

The clauses immediately preceding this provide for well and truly administering the estate according to law, and rendering an account of such administration; then follows this clause touching the disposition of the residue.

The term residue means what remains and so found after the account of the administration is rendered.

What remains after the payment of the debts and administration expenses is the residue intended. The account which is to be rendered is the full, final account of the administration of the estate; upon that account the administrator is to produce his vouchers for payments made to creditors before it can be allowed.

The clause obviously contemplates persons who are by law entitled after creditors have been paid. This is too plain to admit of controversy. If this be not so, then there is no clause in the bond securing the rights of the persons entitled to the residue after payment of debts, for the clause was never intended to secure the payment of both creditors and

distributees, for their claims are not of the same character; the rights of creditors being paramount to those of the distributees, they are to be paid first. A distribution among creditors and legatees, of a residue of an estate from which nothing had been first taken to leave the residue, is a simple absurdity, as well as a palpable contradiction in terms.

To secure the rights of creditors there is no necessity of resorting to a construction so absurd; they are fully protected by the clause requiring a full and complete administration according to law, and a final account to be allowed by the proper authority.

There must be judgment for the defendants upon the demurrer.

VREDENBURGH, J. This is a suit on an ordinary administration bond, containing the condition prescribed by the statute, *Nix. Dig.* 277, § 11.* Among the breaches assigned is the following, *viz.* that the administrator has not paid to the persons entitled all the *residue* of the goods, chattels, and credits found remaining upon the account of the administrator, the same being first allowed by the Prerogative Court.

To this breach the defendant pleaded, that there *was* no residue, but that the estate was *insolvent*. To which the plaintiff replied, that there was $4111.85 residue, which the administrator was directed by the court to pay to the *creditors* of the deceased, at the rate of eighty-three cents to the dollar. To this replication the defendant demurred.

The plaintiff contends, that where an estate is decided to be insolvent under the statute, *Nix. Dig.* 387, § 7,† and the administrator is ordered to pay over to the creditors their *pro rata* share, and the administrator fails to do so, that it is a breach of this condition of the bond. In this he is plainly under a misapprehension. This condition of the bond was provided for no such contingency. The ordinary administration bond, of which this is one, has the following conditions: 1st, that the administrator will make and exhibit

*Rev., p. 761, § 43.    † Rev., p. 772, § 89.

an inventory; 2d, that such goods, chattels, and credits he will well and truly administer according to law; 3d, that he will make a true account of his administration; 4th, that all the residue of said goods, chattels, and credits found remaining upon the account, as allowed by the proper court, he will deliver and pay over to the persons entitled.

A slight reference to the history of legislation upon this subject, as well as the language of the bond itself, will show that the two *first* conditions were provided to secure creditors; the two *last* to secure those entitled to distribution; and that the persons entitled to distribution cannot aver that the two *first* conditions have been broken, nor the creditors aver that the two *last* have been broken. In very early times, the king, as *parens patriæ*, was entitled to the personal property of intestates. He took possession of them, and, practically, after paying debts, gave two-thirds to the widow and children, and kept the balance himself. This payment of debts, and giving two-thirds to the widow and children, was a matter of grace, and not of legal right. He had the legal right to keep the whole, if he saw fit. But in those early times the influence of the Roman clergy was very great, and continually on the increase. The represented to the king that the souls of intestates were inconveniently delayed in purgatory, for the want of masses said for them, and that it was an unconscientious thing in him to deprive the intestate by distribution thus of his own property, just when he most wanted it, and that the king ought to pass his prerogatives in this regard to them, so that they could appropriate it to that use, and thus the true owner get the value of his property. Partly by such persuasions and partly from fear of the pope, the king finally passed these prerogatives to Roman bishops, who, by virtue thereof, stood in the king's shoes, and so legally entitled to the whole personal estate of intestates; and this is the origin of the Ecclesiastical courts of England and the Prerogative and Orphans courts in this state. The Roman clergy, being thus under no legal obligation to pay debts, or to distribute any part of the estate to the next of

kin, felt bound in conscience strictly to execute the trust. The widow and children easily acquiesced in this arrangement, but the creditors were always somewhat reluctant; and accordingly we find that the barons at Runnymede procured an insertion in *magna charta* that the bishops should pay the debts and distribute. But the Roman clergy had influence enough to avoid its execution, so that this provision of the great charter fell obsolete. Not only so, but afterward, in the great charter of Henry the third, they had' influence enough to cause the whole subject matter to be ignored. Things remained in this condition, the bishops having the legal right to all the personal property of intestates, and without either paying debts or accounting to the next of kin, until the 13th year of the reign of Edward the 1st, when it was enacted, that the Ordinary should be bound to pay the debts of the intestates as far as his goods extended. But the Ordinary yet gave no security whatever, and all the residuum, after the payment of debts, still remained in his hands to be disposed of for pious uses. Thus it continued until the 37th year of the reign of Edward the third, when parliament, in consequence of the flagrant abuses practised, enacted that "in case where a death of an intestate occurs, the Ordinary shall depute of the next and most lawful friends of the dead person to administer his goods, which persons deputed shall have action to demand and recover, as executors, the debts of said intestate, to administer and dispense for the soul of the dead, and shall answer also in the king's courts to others to whom the said deceased was holden and bound." It will be observed that this statute merely took from the Ordinaries the power to administer, and compelled them to grant the administration to the next and most lawful friends of the intestate, and all the administrator had to do, was to pay the debts. He gave no bond of security, and he retained all the residuum, after the payment of debts, as his own property.

There was yet no such thing as distribution amongst the next of kin, or security given by the administrator, either to

pay debts or to distribute. As soon as the debts were paid the estate was administered, and there was nothing further to be done by the administrator. All the rest of the estate belonged to himself to *dispense,* in the language of the statute, for the soul of the dead.

The administration by this statute, it will be observed, was granted to the next and most lawful friends of the intestate. This language was afterwards altered by the statute of 21st Henry the 8th, and the Ordinary compelled to grant the administration to the widow or the next of kin of the intestate, and which is the same as our own statute now in force. It will be perceived that as yet no change is made in the rights of the administrator. There is yet no statute of distribution; the administrator takes all after the payment of debts. But this statute of 21st Henry the 8th introduces one great change. It requires, for the first time in the history of administrations, that the Ordinary shall take surety from the administrator, not to distribute, but only to pay debts. It could not have been, surely, that the administrator shall settle in the Prerogative Court, and pay the surplus after the payment of debts to the next of kin, for the surplus yet belonged to the administrator himself, to do with it as he pleased; and, moreover, there was as yet no statute of distribution. But the only surety that could be required was that the administrator would make and exhibit an inventory, and pay the debts, or, as it was then technically called, administer the estate. So that, by the statute of 21st Henry the 8th, the bond given by the administrator contained two conditions; one was the exhibiting an inventory, the other was to pay the debts. These, it will be observed, are the two first conditions in the bond now required by our statute, and which we have above specified. But these two first conditions were provided in the interest of creditors, and not in the interest of the next of kin, because there were yet no next of kin that could take or had an interest in the estate. Things remained in this condition until the 22d of Charles the 2d,

over a hundred years, when the first English statute of distributions was passed.

This statute provided that the Ordinary should call administrators to account, and order a just and equal distribution (after debts and funeral expenses were paid) among the wife and children and next of kin, substantially as our statute does now. And it provided, in the second place, that the Ordinary should require of the administrator a bond with security, and with the same conditions as our statutes now provide, *viz.* 1st, to file an inventory; 2d, to well and truly administer the estate, or, in other words, pay the debts; 3d, account in the Prerogative Court; and 4th, pay the surplus found upon such accounting, to the next of kin.

Hence it is manifest, that these two last conditions in the bond were required to compel the administrator to perform the two additional duties imposed upon him by this last statute of 22d Charles the 2d, *viz.* 1st, to account in the Prerogative Court; 2d, to pay over the surplus found upon such accounting to the next of kin.

This is further manifested from another historical fact. After the said statute of Edward the 3d took away from the Roman bishops the power to administer themselves, and forced them to grant administration to the next of kin, like other people, they were very prompt to force others to be honest, as soon as they had no temptation to be otherwise themselves, and they attempted to force the administrator to give security to distribute to the next of kin; but they were restrained by the courts of common law by prohibitions, upon the ground that the statute of Edward the 3d meant to give to the administrator appointed by the Ordinary the same rights of property that the Ordinary himself had before that statute was passed, and that consequently the administrator was not obliged to account or distribute, and that his only duty was to pay the debts, and that he might do with the surplus what he pleased; and no bond ever was or ever could be required of the administrator to account or distribute, until those additional duties were expressly imposed upon

Ordinary v. Cooley.

him by the said statute of 22d Charles the 2d.  This statute was passed in the year 1661, and was among the very first of our colonial statutes, and has to this day remained unaltered upon our statute book.

So that, by this short historical resumé, it appears that originally the administrator neither paid debts nor distributed. After some hundreds of years, he was first made to pay debts; after some more hundreds of years, he was next made to give security to pay debts; after over a hundred years more, he was made to distribute the surplus, after paying debts, and to insert in his bond the additional condition, that he should distribute.  So that it would appear, that these conditions of our administration bonds of the present day, were the growth of many centuries of English legislation, each additional condition being added as each additional duty was imposed by statute upon the administrator.  Thus we see how each stone was laid in the edifice, and came to have its peculiar form and color.  The very antiqueness of the language of these conditions gives evidence of their origin, and their natural import is in accord with their history.

The declaration does not show whether this suit is prosecuted at the instance of creditors or of distributees.  If by distributees, the plea is a good defence to the breach assigned; if by creditors, there is no breach at all.  But the replication does show on its face that it is not by distributees; and creditors cannot complain that the distributees are not paid.  The creditors can only complain of a breach of the conditions in the bond provided for their security, which conditions are—1st to file an inventory; and 2d, to administer the estate.  If the administrator does not pay the creditors he does not administer the estate, and breaks that condition of the bond, and not the condition under which he is compelled to distribute, and under which this breach is assigned.  The defendant is entitled to judgment on the demurrer.

Judgment for defendant.